JUDGE SCHOFIELD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
NEW YORK LEGAL ASSISTANCE GROUP, INC.,

        Plaintiff,

    -against-

UNITED STATES DEPARTMENT
OF EDUCATION,

        Defendant.
-----------------------------------------------------------------X

15 Civ. _____

15 CV 03818

**COMPLAINT**

RECEIVED
MAY 18 2015
U.S.D.C. S.D. N.Y.
CASHIERS

**PRELIMINARY STATEMENT**

1. This action under the Freedom of Information Act ("FOIA") seeks to compel the release of documents that will enhance public understanding and oversight of one of the least understood aspects of the trillion-dollar federal student loan program: the process for borrowers to assert defenses to repayment based on school misconduct.

2. More than twenty years ago, Congress directed the United States Department of Education ("Department") to establish policies and procedures pursuant to which student loan borrowers could assert defenses to the repayment of their loans based on the misconduct of the schools they attended. Although the Department promulgated a barebones regulation, to date, the Department has provided virtually no guidance to student loan borrowers or consumer advocates about how to assert these important rights.

3. In recent months, the Department's failure to establish and publicize policies and procedures regarding borrower defenses to repayment has become a matter of public concern in light of the demise of Corinthian Colleges, Inc. ("Corinthian"), a large chain of for-profit schools whose predatory practices are the target of lawsuits by several state attorneys general. Given the

1

Department's failure to implement and publicize robust procedures to evaluate borrowers' defenses to repayment, students of Corinthian and other unscrupulous schools face uncertainty in pursuing their legal rights.

4. Plaintiff New York Legal Assistance Group, Inc. ("NYLAG") submitted a FOIA request to the Department in December 2014, seeking disclosure of records related to borrower defenses to repayment and related documents.

5. NYLAG, a major New York legal services organization, is involved in a wide range of advocacy efforts on behalf of current and former students of for-profit schools, including federal student loan borrowers who have asserted their rights with respect to repayment of their loans based on schools' misconduct.

6. By requesting public records from the Department, NYLAG seeks to fulfill its organizational mission to fully and zealously represent its clients, improve its capacity to assist poor and low-income student loan borrowers, and to educate the public about important government benefits and statutory rights.

7. To date, after almost five months, the Department has not provided any substantive response to NYLAG's request.  Therefore, NYLAG brings the present action to compel compliance with the Department's obligations under FOIA.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  In particular, the Freedom of Information Act (5 U.S.C. § 552(a)(4)(B)) provides that this Court has jurisdiction over any action to enjoin the Department from withholding agency records and to order the production of any records improperly withheld.

9.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (e), and 5 U.S.C. § 552(a)(4)(B), because the Plaintiff's principal place of business is there, and a substantial part of the events giving rise to this claim occurred there.

## PARTIES

**Plaintiff NYLAG**

10.     Plaintiff NEW YORK LEGAL ASSISTANCE GROUP, INC. is a not-for-profit New York corporation with its principal place of business at 7 Hanover Square, New York, New York.

11.     NYLAG provides high quality, free civil legal services to low-income New Yorkers, a large number of whom are student loan borrowers.  NYLAG's client base encompasses individuals who are most often targeted by abusive schools: those with low incomes, who are foreign-born, or who come from minority communities.

12.     NYLAG's services include direct representation, case consultation, advocacy, community education, training, financial counseling, and impact litigation.  In 2014, through NYLAG's For-Profit Schools Project and related financial counseling services, NYLAG counseled approximately 500 individuals about their student loan debt.

13.     NYLAG is lead counsel in two different putative class actions brought on behalf of borrowers regarding predatory practices of for-profit educational institutions: *Salazar et al. v. Duncan*, 15-832 (2d Cir. 2015) and *Sanchez et al. v. ASA College, Inc.*, 14 Civ. 5006 (S.D.N.Y. 2014).

14.     NYLAG has submitted defense-to-repayment applications to the Department on behalf of clients who attended schools in New York operated by the national for-profit chain Career Education Corporation ("CEC").

15. As a member of a coalition of New York City-based organizations that advocate on behalf of clients victimized by for-profit schools' deceptive practices, NYLAG is actively involved in a wide range of policy initiatives to increase oversight of for-profit schools.

16. The website for NYLAG's For-Profit Schools Project is a resource for members of the general public interested in for-profit schools and student debt, and provides information including news articles in English and Spanish regarding for-profit schools' business practices; "know your rights" resources; information for borrowers on possible legal remedies; and testimony submitted by NYLAG attorneys in federal rulemaking proceedings. Much of this content is based on information received from prior public records requests.

**Defendant U.S. Department of Education**

17. Defendant UNITED STATES DEPARTMENT OF EDUCATION is a federal agency with its principal place of business at 400 Maryland Avenue SW, Washington, D.C. The Department is responsible for administering federal student loan and grant programs in the United States.

18. Defendant is an "agency" within the meaning of 5 U.S.C. § 552(f)(1).

## NYLAG'S FOIA REQUEST

19. NYLAG has requested records from the Department related to the Department's implementation and interpretation of statutory and regulatory provisions for student loan borrower defenses and discharge rights. The information requested is critical to NYLAG's ability to obtain relief for its clients who have been defrauded by for-profit schools.

**Factual and Legal Background**

20. The Higher Education Act of 1965 and its amendments authorize the federal student financial aid program, often referred to as "Title IV." 20 U.S.C. § 1071, *et seq*.

21. The Department administers various Title IV loan programs, including the Federal Family Education Loan ("FFEL") Program and the William D. Ford Federal Direct Loan Program, 20 U.S.C. §§ 1087a-1087j, which provide loans to students at higher-education institutions.

22. The FFEL Program provides for third-party lenders to make loans to "eligible [student] borrowers," loans that are ultimately re-insured by the Department. 20 U.S.C. §§ 1077, 1091(a). New loans under the FFEL Program were discontinued as of July 1, 2012.

23. Under the Direct Loan Program, as the name implies, the federal government directly lends money to eligible student borrowers for use at "participating institutions of higher education" as approved by the Department.

24. These loan programs are an important source of financing for low-income and other borrowers, but they have also been used as a major source of revenue by for-profit colleges and universities which encourage students to enroll (and to fund their education with federal loans through false and misleading representations to the students). Certain higher-education institutions have maintained their eligibility to participate in Title IV programs only by making false and misleading representations to the Department, as well as to state regulators and private accrediting agencies. These exploitative practices have caused borrowers to become saddled with extensive debt that the borrowers have little chance of being able to repay.

25. A 2012 report of the United States Senate's Health, Education, Labor and Pensions ("HELP") Committee, entitled "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," as well as other studies regarding for-profit colleges, have documented schools' abusive practices that include, but are not limited to:

a. Falsely certifying a student's eligibility for, or ability to benefit from, their programs, thus enabling schools to obtain loan disbursals on students' behalf, in contravention of the law and program guidelines;

b. Improperly attracting students by touting inflated graduation or employment statistics, which convey an inaccurate and misleading impression of the value of the program to student borrowers;

c. Employing high-pressure sales tactics and deceptive marketing campaigns to pressure students into enrolling and signing loan documents on the spot;

d. Inducing students to enroll and sign up for loans on the basis of false information about the nature of their loan obligations and the true cost of the program;

e. Falsely representing that credits earned at their institution will be transferrable to other education institutions, or failing to disclose that differences in school accreditation standards may in fact render education credits non-transferrable;

f. Misrepresenting that an institution's accreditation status will permit students to sit for professional license or credential exams that are de facto requirements for employment in the students' field of study; and

g. Promising non-citizen enrollees that they will be able to receive work permits or green cards upon graduation, but failing to fulfill those promises for a substantial number of supposedly eligible students.

26. Although the for-profit higher education sector has evolved over time to include large, publicly owned as well as private-equity funded corporations offering degree programs, the abuses documented in the HELP Committee Report are consistent with the earlier findings of

a 1991 report of the United States Senate's Committee on Governmental Affairs's Permanent Subcommittee on Investigations, entitled "Abuses in Federal Student Aid Programs."

27. In response to such longstanding abuses, Congress has created certain statutory rights for federal loan borrowers to obtain loan discharges and defend against repayment.

28. For example, where an institution falsely certifies that a student is eligible for a federally guaranteed student loan (for example, by falsely stating that the student had a high school diploma or GED), that student is eligible to have his or her loans discharged. Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 (codified as amended at 20 U.S.C. § 1087); 34 C.F.R. § 682.402(e)(1); 34 C.F.R. § 685.215(a)(1). Borrowers are also eligible to obtain discharges under certain circumstances when a school owes the borrower an unpaid tuition refund, 34 C.F.R. § 682.402(*l*); *id.* § 685.216, or when a school closes while the student is still enrolled, *id.* § 682.402(d); *id.* § 685.214.

29. In the Higher Education Amendments of 1992, Congress also directed the Secretary of the Department ("Secretary") to study the possibility of permitting students to raise fraud-based state law defenses against repayment of student loans. In response to Congress's directive, the Secretary prepared a common promissory note for all FFEL Program loans, providing that any entity holding a FFEL loan "is subject to all claims and defenses that the borrower could assert against the school," when certain criteria are satisfied. *See* 34 C.F.R. § 682.209(g).

30. The following year, Congress gave the Secretary similar direction with regard to Direct Loan Program loans. *See* 20 U.S.C. § 1087e(h). Pursuant to Congress' directive, the Secretary promulgated a regulation that permits a Direct Loan borrower to assert, as a defense to repayment, "any act or omission of the school attended by the student that would give rise to a

cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c). During the rulemaking proceedings, the Secretary took the position that no further regulatory changes were necessary to implement the statutory defense-to-repayment provision, and that "the adjudication of individual claims will provide further explanation of the Secretary's interpretation of the regulatory requirements." Notice, 60 Fed. Reg. 37,768, 37,769 (July 17, 1995).

31. However, the Department has not adequately disclosed to the public the existence of these various statutory rights, and in many instances has adopted unduly restrictive interpretations and burdensome procedures for borrowers to avail themselves of these rights. In particular, the Department has disclosed virtually no information regarding the defense-to-repayment provisions under the FFEL and Direct Loan Programs, nor has the Department disclosed guidance regarding defense-to-repayment based on its adjudication of individual claims.

32. For-profit educational institutions' predatory practices have been the subject of extensive investigation by certain state and federal authorities, particularly in recent years. For example, in 2013, the New York State Attorney General settled claims under the New York General Business Law against the CEC, the owner of several for-profit school chains. Pursuant to the Assurance of Discontinuance, CEC agreed to make extensive changes to its marketing and promotional activities to remedy the myriad violations of New York consumer protection law that the Attorney General had found.

33. Further, since 2007, twenty three state attorneys general have launched investigations or issued subpoenas, often leading to civil litigation, against Corinthian for that institution's legion misrepresentations to students, and false and predatory advertising.

34. These state investigations into the deceptive practices of for-profit schools have been accompanied by pressure on the Department from federal legislators and the White House to afford relief to low-income borrowers. For example, on December 9, 2014, thirteen current United States Senators sent a letter to Secretary Arne Duncan requesting information on Department policies and procedures regarding debt relief, including defense to repayment. This letter was followed by a February 25, 2015 request from six Senators to Secretary Duncan, observing that "[t]o date . . . the Department of Education has yet to give borrowers a clear idea of how to exercise" their rights to assert defenses to repayment based on school misconduct. "Instead, the Department continues to gouge borrowers who struggle to meet their payments, subjecting them to debt collection, wage and benefit withholding, and other harsh penalties even when it is clear that the debtors cannot pay."

35. Indeed, on March 15, 2015, President Obama issued a "Student Aid Bill of Rights," directing the Secretary of Education and others to implement various policies to aid borrowers. These directives include that the Department formally report to the President as to whether the Department has sufficiently implemented the defense to repayment provisions.

36. On March 31, 2015, at a meeting with Department Under Secretary Ted Mitchell and the Consumer Financial Protection Bureau, former students of Corinthian submitted hundreds of defense-to-repayment requests. To date, approximately 1,000 Corinthian borrowers have asserted defenses to repayment. As of the filing of this Complaint, the Department has made no decision on these submissions.

37. In the face of continued inaction by the Department to implement and publicize its defense-to-repayment procedures, on April 9, 2015, a coalition of nine state attorneys general representing Massachusetts, California, Connecticut, Illinois, Kentucky, New Mexico, New

York, Oregon, and Washington wrote the Secretary in light of their experience investigating and prosecuting for-profit schools, asking the Secretary to provide guidance for borrowers to assert defenses. The attorneys general also suggested procedures by which groups of students could obtain relief based on the investigative findings of a state attorney general regarding a school's misconduct.

38. In a May 13, 2015 letter addressed to Secretary Duncan, a coalition of twelve attorneys general representing Kentucky, Connecticut, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Missouri, New Mexico, New York, and Oregon reiterated that borrowers "should be able to raise Corinthian's fraud as a defense to repayment," and thus urged the Department "to provide clear guidance to all such students on how to assert a claim for relief."

39. In recent weeks, rather than provide comprehensive responses to any of the serious questions raised by U.S. Senators and state attorneys general, the Department has made a series of ad hoc and self-serving comments to attempt to justify its inaction over the last two decades. For example, the Department has stated that "only about five borrowers had ever sought to use the" defense to repayment provision. The Secretary has also remarked that "the rules weren't very clear" on student debt forgiveness and that the Department has not "ha[d] a lot of practice" in administering such policies.

40. When students formally assert defense-to-repayment requests, the Department provides incomprehensible responses that do not acknowledge the statutory and regulatory provisions that give rise to borrowers' rights.

41. For example, on March 30, 2015, a Department representative responded to a NYLAG client's defense-to-repayment submission by mischaracterizing the request as one for "discharge . . . due to unemployment."

42. In an April 10, 2015 letter to the same client, the Department's Default Resolution Group Servicing Center asserted that "[m]isrepresentations by [a] school . . . do not relieve [a borrower] of the obligation to repay."

43. In an April 24, 2015 letter response to another NYLAG client's defense-to-repayment request, a loan servicer under contract with the Department erroneously stated that federal law "only provide[s] for forgiveness of a student loan in the cases of death, total and permanent disability, and in some cases of school closure," and "specifically preempts state laws that interfere with . . . requiring borrowers to repay their student loans in full."

44. The Department has not made public any guidance regarding its "adjudication of individual" defense-to-repayment "claims," notwithstanding its statement twenty years ago that such adjudications would "provide further explanation of the Secretary's interpretation of the regulatory requirements." *Cf.* Notice, 60 Fed. Reg. 37,768, 37,769 (July 17, 1995).

**Request and Non-Response**

45. Because the Department has not made public important information related to its student debt relief policies and practices, NYLAG sought to obtain and compile this information and convey it to those in the greater New York area, and nationally, against whom the Department has continued to enforce purported repayment obligations.

46. On December 5, 2014, NYLAG sent a FOIA request (the "Request" – attached hereto as Exhibit A) to the Department's FOIA Public Liaison Officer at the email address provided for such requests: EDFOIAManager@ed.gov.

11

47. NYLAG's Request sought records related to the Department's implementation and interpretation of statutory and regulatory provisions related to borrower defenses and discharge rights. NYLAG also sought a waiver of fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 34 C.F.R. § 5.33(a) as NYLAG is a non-profit institution seeking information material to its work representing low-income New Yorkers. NYLAG requested that the Department produce responsive records on a rolling basis.

48. The Department acknowledged receipt of NYLAG's Request in a December 8, 2014 email and assigned the Request Number 15-00417-F.

49. On December 18, 2014, a representative of the Department's FOIA Public Liaison FOIA Service Center sent NYLAG an email stating that the Department had denied the fee waiver associated with a third-party's request, Number 15-00418-F.

50. On January 6, 2015, a representative of the Department's FOIA Public Liaison FOIA Service Center emailed NYLAG a letter clarifying that the Department had denied the fee waiver associated with NYLAG's Request, Number 15-00417-F.

51. On January 8, 2015, approximately 22 working days after the submission of the Request, a representative of the Department's FOIA Public Liaison Office emailed NYLAG to inform it that the Request would "not be processed within the 20 working-day time limit." The email did not provide any update on when the Request would be processed. Nor did the email indicate that the Department would seek a ten-day extension for "unusual circumstances" as defined in FOIA, 5 U.S.C. § 552(a)(6)(B)(i).

52. Because the Department's fee waiver denial was erroneous as a matter of law, NYLAG submitted an administrative appeal on January 21, 2015.

53. On or around February 2, 2015, the Department granted NYLAG's fee waiver request. The Department did not provide any further information on the status of NYLAG's Request at that time.

54. As of the date of this Complaint, the Department has not produced any documents in response to the FOIA Request.

55. The continued delays of the Department are imposing significant harm on low-income borrowers in the State of New York and elsewhere, who remain unaware of the procedures to assert defenses available to them regarding the repayment of their student loans, and the Department's steps to implement the defenses guaranteed to borrowers under federal statutes, regulations, and the terms of their promissory notes.

56. Per the statutory provisions of FOIA, Plaintiff is deemed to have exhausted its administrative remedies with respect to NYLAG's Request because more than twenty working days have passed with no response or determination from the Department on whether to withhold or disclose any or all of the requested documents. 5 U.S.C. § 552(a)(6)(A)(i), (a)(6)(C)(i).

## CAUSE OF ACTION
## VIOLATION OF THE FREEDOM OF INFORMATION ACT

57. Plaintiff incorporates the above paragraphs as if fully set forth herein.

58. Plaintiff submitted a valid FOIA request to Defendant on December 5, 2014.

59. Defendant's failure to timely produce responsive records has violated Plaintiff's rights under FOIA, 5 U.S.C. § 552.

60. Pursuant to FOIA, Plaintiff is entitled to injunctive relief and other remedies.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiff requests that this Court:

(1) Declare that Defendant's failure to disclose the records requested by Plaintiff is

unlawful;

 (2) Issue an injunction ordering Defendant promptly to produce to Plaintiff the requested records in their entirety pursuant to 5 U.S.C. § 552(a)(4)(B);

 (3) Award Plaintiff costs and reasonable attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E); and

 (4) Grant such other and further relief as the Court may deem just and proper.

Dated: May 18, 2015
    New York, New York

BETH E. GOLDMAN
NEW YORK LEGAL ASSISTANCE GROUP
7 Hanover Square, 18th Floor
New York, NY 10004
Tel.: (212) 613-5000

By Eileen Connor, of Counsel
  Jane Greengold Stevens, of Counsel
  Jason Glick, of Counsel

*Attorneys for Plaintiff*

# EXHIBIT A



YISROEL SCHULMAN, ESQ.
President & Attorney-in-Charge

U.S. Department of Education
Office of Management
Regulatory Information Management Services
400 Maryland Avenue, SW, LBJ 2W220
Washington, DC 20202-4536
EDFOIAManager@ed.gov

ATTN: FOIA Public Liaison

*VIA ELECTRONIC MAIL*

December 5, 2014

Re:  Freedom of Information Act Request for Records Relating to Borrower Defenses to Repayment of Student Loans

Dear FOIA Public Liaison Officer:

This request for records is submitted pursuant to the Freedom of Information Act, 5 U.S.C. § 552, and the Department of Education's implementing regulations, 34 C.F.R. § 5.1 *et seq*.  The New York Legal Assistance Group (NYLAG) is a non-profit, public interest group, and we seek these records for non-commercial uses.

## Background

As directed by Congress in the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, Subtitle A, the Secretary promulgated regulations providing for borrower defenses under the Direct Loan Program.

34 C.F.R. § 685.206(c) provides that a borrower may, "[i]n any proceeding to collect on a Direct Loan, … assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."

The Secretary's introductory comments state that this regulatory provision allows a borrower to "request that the Secretary exercise his long-standing authority to relieve the borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."  Notice of Proposed Rulemaking, 59 Fed. Reg. 42,646, 42,649 (Aug. 18, 1994).  Further, the Secretary promised to "work with interested parties to develop regulations for borrower defenses that would apply to both the Direct Loan Program and the FFEL Program."  *Id*.  The regulation sets forth "an acceptable interim standard" pending "further detailed guidance" on borrower defenses.  Final Regulations, 59 Fed. Reg. 61,664, 61,671 (Dec. 1, 1994).

In 1995, the Secretary convened the Borrower Defenses Regulations Negotiated Rulemaking Advisory Committee.  The issues presented for negotiation included a determination of "which acts or omissions of an institution of higher education a borrower [could] assert as defenses to a demand for repayment of a loan made under the Direct Loan, FFEL, and Perkins Programs."  Notice of Intent, 60 Fed. Reg. 11,004 (Feb. 28, 1995).

The Committee recommended at the first meeting that no changes be made to existing regulations, as the current regulations adequately addressed the issue of borrower defenses.  The Secretary adopted this recommendation, and clarified that "claims of defenses by Direct Loan borrowers based on State laws should be recognized by the Department only if the school's act or omission has a clear, direct relationship to the loan." Notice, 60 Fed. Reg. 37,768, 37,769 (July 17, 1995).  Further, "the adjudication of individual claims will provide further explanation of the Secretary's interpretation of the regulatory requirements."  *Id.*

Finally, the Secretary clarified that the borrower defense provision in the Direct Loan Program, 34 C.F.R. § 685.206(c), is a "similar standard" to the FFEL Program regulation, 34 C.F.R. § 682.609, which provides that an institution may be liable if a FFEL Program loan is legally unenforceable, a claim which may be raised by a borrower during the collection process, as provided by 34 C.F.R. §§ 30.24, 682.410(b)(5)(ii)(C), and 682.410(b)(5)(vi)(I). 60 Fed. Reg. 37,768, 37,769–70.

### Records Relating to Defenses to Repayment of Student Loans

NYLAG seeks records relating to the Secretary's implementation and interpretation of the regulations concerning borrower defenses to the repayment of student loans under the Direct Loan and FFEL Programs.

As used in this request, "**borrower defense(s) to the repayment of a student loan**" refers to any defense to repayment of a borrower under the Direct Loan or FFEL program relating to an act or omission of a school, as provided for in 34 C.F.R. §§ 682.609, 685.206(c).

As used in this request, "borrower defense(s) to the repayment of a student loan" is distinct from "discharge" of a student loan.  As used in this request, "**discharge**" of a student loan refers to the cancellation of a student loan under the Direct Loan and FFEL Programs for reason of death, disability, closed school, false certification, unpaid refund or bankruptcy, as provided for in 20 U.S.C. § 1087 and implemented by regulations of the Direct Loan and FFEL Programs.

For the purpose of this request, "**records**" includes all recordings or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, e-mails, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies.

A reference to "**the Department**" means the Department of Education and any and all of its subparts, including (but not limited to) the Office of the Inspector General, Student Financial Assistance, and the Office of Postsecondary Education.

Unless otherwise noted, the time period relevant to this request is **July 1, 2011 to the present**.

**Request #1**:   Records of all Department guidance, direction, and/or instruction provided to any guarantee agency, Private Collection Agency (PCA), Title IV Additional Servicer (TIVA), Non-Profit Servicer (NPS), guarantee agency or Department subdivision concerning the application, consideration, resolution and/or adjudication of any discharge or borrower defense to the repayment of a student loan, operative for any time from July 1, 2011 to the present (even if provided earlier than July 1, 2011).

**Request #2**:   Records of all Department guidance, direction, and/or instruction provided to any PCA, TIVA, NPS, guarantee agency or Department subdivision concerning reporting to the Department of information relating to any borrower request for discharge or borrower defense to the repayment of a student loan, operative for any time from July 1, 2011 to the present (even if provided earlier than July 1, 2011).

**Request #3**:   Records of all Department guidance, direction, and/or instruction provided to borrowers or the general public related to defense(s) to repayment of a student loan to the Department and/or any guarantee agency, PCA, TIVA, or NPS, operative for any time from July 1, 2011 to the present (even if provided earlier than July 1, 2011).

**Request #4**:   Records, including any summary or tabulation, of the total number of defenses asserted by borrowers to the repayment of a student loan received by the Department or any guarantee agency, PCA, TIVA, or NPS. This request seeks records broken down by the entity receiving the borrower's asserted defense, and seeks records of whether the defense was recognized, denied, or is still pending, broken down by entity.

**Request #5**:   Records of the number of loans transferred from any PCA, TIVA, NPS or guarantee agency to the Department's Default Resolution Group for consideration, resolution and/or adjudication of a borrower defense to the repayment, or discharge, of a student loan, including but not limited to records of the nature of the disposition of such defenses and loans and the time period during which such dispositions were reached.

**Request #6**:   Records of communications, including inquiries, correspondence, calls, requests, etc., received by the Federal Student Loan Ombudsman concerning a borrower defense to the repayment of a student loan.

**Request #7**:   Records of all Department-approved or -created letters used by any PCA, TIVA, NPS or guarantee agency to counsel, inform, and/or advise borrowers regarding a borrower defense to the repayment, or discharge, of a student loan, including records of the transmission by the Department of such letters to any PCA, TIVA, NPS, or guaranty agency.

**Request #8**:   Records of administrative wage garnishment proceedings conducted by any PCA, TIVA, NPS, guarantee agency and/or the Department, in which the borrower raised a defense to the repayment of a student loan, and records of the resolution of the asserted defense.

**Request #9**:   Records of treasury offset proceedings in which the borrower raised a defense to the repayment of a student loan, and records of the resolution of the asserted defense.

**Request #10**:   Records of Department actions, including recoupment, investigation, or enforcement actions, taken as the result of the assertion in any collection activity under the Direct Loan and/or FFEL Programs of a borrower defense to the repayment of a student loan.

**Request #11**:   Records, including any summary or tabulation, of the total number of loans, and dollar amount of loans, under the Direct Loan and FFEL Programs, that have been discharged, including but not limited to records referring to category of discharge and fiscal/program year.

**Request #12**:   Records, including any summary or tabulation, of the total number of loans, and dollar amount of loans, under the Direct Loan and FFEL Programs, that have been cancelled, forgiven and/or written off, because of a borrower defense to the repayment of a student loan, broken down by fiscal/program year or other time period for which such records refer.

**Request #13**:   Records of any estimates, projections, and/or analyses of the allowance for subsidy, as defined in the Federal Credit Reform Act, in the Direct Loan program attributable to loan cancellation (attributable to borrower defense(s) to repayment or otherwise), discharge, compromise, or other write-off of federal student loans, broken down by fiscal/program year and category of allowance.

**Request for Waiver of Fees:**

I request a waiver of all fees for this request.  Disclosure of the requested information to the New York Legal Assistance Group is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Department of Education, including its administration of the billion-dollar federal student loan program.  *See* 5 U.S.C. § 552(a)(4)(A)(iii); 34 C.F.R. § 5.33(a).  Because NYLAG is a nonprofit organization dedicated to free legal services to low-income New Yorkers, this request will serve no commercial interest.  *See id.*  NYLAG is a member of an advocacy group dedicated to investigating practices of proprietary schools that may harm students.  We seek this information

specifically to disseminate to the other organizations that are members of that advocacy group, which in turn will disseminate it to their clients, who are New Yorkers enrolled in or considering enrolling in proprietary schools.  Additionally, NYLAG and its advocacy partners disseminate information to the public through their websites and by the production of special reports.

Should you deny this waiver request, I am willing to pay fees up to a maximum of $25.  If you estimate that the fees will exceed this limit, please advise me of the costs before proceeding.  *See* 34 C.F.R. § 5.32(c).

I look forward to receiving a determination pursuant to each request within twenty business days, as required by 5 U.S.C. § 552(a)(6)(A)(i) and 34 C.F.R. § 5.21(c).  Please also inform me on a rolling basis of the existence of any records responsive to any request as you identify them, regardless of whether additional records responsive to that or other requests may be identified in the future.  I am willing to accept records in electronic format.

If for any reason any request is denied, please inform me of the reason(s) for the denial in writing.

Thank you very much for your assistance.

Sincerely,

Eileen Connor
New York Legal Assistance Group
7 Hanover Square, 18th Floor
New York, New York 10004
econnor@nylag.org
(212) 613-6544